# CIRCUIT COURT OF ROCKINGHAM COUNTY

Malcolm R. Sullivan
and Marguerite V. Sullivan

v.

Henrietta G. Brown

January 26, 2000

Case No. (Chancery) 16524

BY JUDGE JOHN J. MCGRATH, JR.

This case is before this court on Plaintiff's Bill of Complaint for declaratory and injunctive relief. The action was brought pursuant to Va. Code § 8.01-184 *et seq.* for a determination of rights of the parties with respect to a claimed easement over the defendant's land. Because this suit involves easements and purported rights-of-way going back over a century, the facts that follow are, of necessity, quite lengthy and complicated.

In the mid-to-late 1800's, Reuben Peterfish owned about 500 acres of land in northeastern Rockingham County ("the Reuben Peterfish farm"). During this time, a private lane ("old farm road") had been established for the purposes of accessing the various parts of the farm. The road originally ran from the southern part of the farm north through a ravine and continuing north-northeast out to a public road. As it crossed the land, the road followed,

in part, the natural terrain at the bottom of a ravine or gully and in one place crossed a stream near a spring and large stream pool or water hole. (Tr. 40-41, 75-90.) Although in very rustic form, this road still exists today. This water hole at the spring has been used by those living on and farming the Reuben Peterfish farm for at least seventy or eighty years. In fact, witnesses testified that the water hole at the spring was the "only water that was on the place" and historically has been the sole source of water for persons living there. (Tr. 54, 70, 182, 184.)

Upon the death of Reuben Peterfish and, subsequently, his wife Margaret, his land was partitioned among the four surviving children of the couple, Mary Peterfish, Andrew Jackson Peterfish, Emma Peterfish, and Sarah Peterfish-Layman. By deed dated December 20, 1888, Andrew Jackson, Emma, and Mary conveyed the southernmost 159 acres of land to Sarah Peterfish-Layman, along with a "right to the spring on the land laid off to Emma Peterfish and also a right-of-way along the Lucius Dovel line across the lots assigned to Andrew Jackson and Emma Peterfish to the public road." (See exhibit 2-A-1.) (The so-called "Lucius Dovel" line ran the length of the easternmost boundary of what would become Andrew Jackson's land.) Subsequently, the rest of the land was conveyed by each of the children to another sibling. On December 29, 1888, the 144 acres immediately north of and adjacent to Sarah's land was conveyed to Andrew Jackson Peterfish. (See exhibit 2-B-1.) On January 30, 1889, the 50 acres directly north of and adjacent to Andrew Jackson's tract was conveyed to Emma and the 145 acres of land adjoining Emma's land to the north was deeded to Mary. (See exhibits 2-C-1 and 2-D-1.) Although the latter three deeds were dated December 29, 1888, (Andrew Jackson) and January 30, 1889, (Emma and Mary), they were not fully executed until September 27, 1890, and not recorded until 1916, 1891, and 1892, respectively.

Prior to 1904, Emma and Mary Peterfish lived in the "Peterfish home place," located on Emma's 50 acre tract, along with Lillie Gibson, (and Lillie's children) who Emma and Mary had hired to manage their farm. (Tr. 67.) In 1904, the Peterfish home place burned down and Emma, Mary, and the Gibsons renovated, enlarged and moved into the house on the eastern portion of the land originally conveyed to Sarah (the southernmost portion of the original Reuben Peterfish farm). (Tr. 67-68.) Although the Peterfish farm was partitioned, the Reuben Peterfish children continued to run the farm as a single unit that Lillie Gibson managed. (Tr. 52, 78, 114.) When the Peterfishes and Gibsons moved to the new house, approximately 21 acres of the easternmost portion of that tract (including the house) was conveyed to Lillie F. Gibson and her children. Also conveyed was a "right-of-way to the spring on the land

laid off to Emma Peterfish and also a right-of-way along the L[ucius] Dovel line across the lots assigned to [Andrew] Jackson and Emma Peterfish to the public road." (Exhibit 2-A-3.) Prior to 1908, when Lillie Gibson purchased a right-of-way from the landowners adjoining her to the east, the old farm road was the only way to access the Lillie Gibson place from the road or other parts of the farm. (Tr. 75, 233.) After the purchase of this new right-of-way, the old farm road was no longer used as a means to access the public road; however, it was still used to access the watering hole from Lillie Gibson's house. (Tr. 53-56.) Due to this, the portion of the "old farm road" generally north of the water hole was not used any longer and no longer exists in definable form. In short, today the northern terminus of the old farm road is the water hole.

As mentioned earlier, this watering hole with its spring was the source of water used and relied upon by those living on and farming the Reuben Peterfish land. After the land was partitioned, everyone continued to use this water hole and spring, as it was the only water source on the land. (Tr. 54, 70, 182-84.) This water hole and spring, however, is not on Emma Peterfish's land, as is stated in the original deed and right-of-way given to Sarah. The water hole and spring is actually located on the land originally deeded to Andrew Jackson Peterfish and is located about 270 feet south of the Emma Peterfish line.

At some point before 1911, Sarah conveyed her interest in her parcel back to Emma and Mary. In 1911, Emma and Mary Peterfish, then owners of the remaining 138 acres of the Sarah Peterfish-Layman tract of land (the southernmost parcel) conveyed it all to Lillie Gibson and, at her death, to her children. (Exhibit 2-A-5.) This conveyance resulted in Lillie Gibson owning the whole 159-acre tract that was originally deeded to Sarah.

In 1914, after the death of Andrew Jackson Peterfish, Emma and Sarah divided his land (hereinafter referred to as the "Andrew Jackson" parcel) into two parcels. The northernmost 73 acres was conveyed to Sarah Peterfish-Layman and her husband; this tract was directly south of and adjacent to Emma's original 50 acres. (Exhibit 2-B-4.) The southern 67 acres was conveyed to Emma; this land was north of and adjacent to Sarah's original parcel, which was now completely owned by Lillie Gibson. (Exhibit 2-B-5.) The deed conveying the southern part of Andrew Jackson's parcel to Emma grants a "right-of-way to a certain spring on said Sarah Peterfish-Layman's land." *Id.* This reference was to the same spring that everyone living on the original Reuben Peterfish farm was using as his or her source of water. (Deposition of R. Jenkins, 3.) The spring was on the land now owned by Sarah Peterfish-Layman; it had originally belonged to Andrew Jackson. In 1915, Emma conveyed her interest in the Andrew Jackson parcel (the

Southern portion) to Lillie's son, Claude Gibson, reserving a life estate for herself and Lillie Gibson. This deed conveyed the same right-of-way to the spring that her deed had given her. (Exhibit 2-B-6.) In 1924, the northern part of the Andrew Jackson parcel, now owned by Sarah, was then conveyed to Claude Gibson and his wife. (Exhibit 1.) When Lillie Gibson died in November 1959, Claude Gibson became the owner of the entire original Andrew Jackson parcel of land. When he died in December 1959, his children, including the defendant, Henrietta Brown, inherited this land. (Tr. 222, Exhibit 2-B-12.)

In 1961, the heirs of Lillie Gibson, including the defendant, Lillie's granddaughter, Henrietta Brown, (who had inherited the southernmost potion of the Reuben Peterfish farm from Lillie) joined in a deed conveying their interest in the southernmost parcel of the farm (that land originally conveyed to Sarah) to T. W. Mundy. (Exhibit 2-A-6.) This deed conveyed "a certain right-of-way to a spring and a right-of-way to the public road as set out in the deed from Emma Peterfish and Mary Peterfish to Lillie F. Gibson and her children." (See exhibit 2-A-6.) The deed also specifically referenced and incorporated a plat of the conveyed land that showed a water right-of-way appurtenant to the conveyed land and transversing the servient Andrew Jackson parcel (now owned by Claude Gibson's heirs, including the defendant, Brown) in the location of the existing "old farm road." All the owners of this land and the owners of the land not sold but affected by the water right-of-way, including the defendant, Henrietta Brown, signed this deed. (Exhibit 2-A-6.) In 1967, T. W. Mundy and his wife conveyed the easternmost 21.48 acres (the land previously known as the Lillie Gibson homeplace) to Lillie's grandson, the Plaintiff, Malcolm R. Sullivan and his wife, Marguerite. This deed also references this water right-of-way. (See exhibit 2-A-7.)

The Plaintiff, Malcolm Sullivan has owned this parcel of land ever since acquiring it from T. W. Mundy in 1967. The only access to the water hole at the spring from this parcel of land is along the "old farm road." (Tr. 90.) Although this road generally follows the natural terrain at the bottom of a ravine, historically it was fenced along both its eastern and western edges from the boundary of the Andrew Jackson parcel and the Sarah Peterfish-Layman/Lillie Gibson parcel to the water hole at the spring. This was done in order to prevent cattle and other livestock from grazing in the fields planted in crops, either to the east or west of the road. (R. 165-66; Deposition of R. Jenkins, 4.) The Plaintiff restored these fences in the 1960's, and when he did so, Guy Gibson, Brown's brother, instructed that Sullivan follow the old fence line. (Tr. 165-66.) This road has been used continuously by the owners of the

Sullivan tract and by his predecessors in title for access to the water hole and spring for as far back as witnesses could remember. (Tr. 53-56, 182.)

Prior to 1994, when Brown acquired the entire Andrew Jackson parcel from her siblings, Sullivan had orally leased part of the Andrew Jackson parcel of land from the defendant, her brother, Claude Gibson, and their sister, Mildred Klein, for the grazing of livestock. (Tr. 102.) Subsequent to her acquisition of the property, Brown insisted that Sullivan sign an extensive, written lease for the land. (Tr. 248.) When Brown and Sullivan failed to come to an agreement, Brown demanded that Sullivan remove his cattle from her land and informed him that he had no right-of-way to and could not use the old farm road nor the water hole at the spring. (Tr. 175.) In fact, she maintained that the reference to the "spring" in the deeds was to a spring actually on Emma's land; she testified, however, that she never has seen any such spring on Emma's land and other witnesses testified that this was the only spring on the land. The Plaintiff testified that "there was no way that Andrew Jackson, or that strip of land that I have, could have ever survived without having the spring and the creek." (Tr. 111.) As far back as anyone can remember, this spring has been the source of water for the Peterfish farm. Sullivan has tried to drill wells for water on his property; however, after three tries, they were only able to get one well he could use; however it only produces enough water for drinking; it is not adequate for farming. (103-04.) Without access to the water hole and spring, Sullivan cannot farm the property nor keep livestock there. (Tr. 111.)

Plaintiff claims that he has a valid right-of-way to the water hole at the spring by way of the old farm road. He maintains he has a right to this by grant, implied easement of necessity arising from preexisting use, and/or estoppel. This court will address each of these in order.

In Virginia, it is well-established that an easement is "a privilege to use the land of another in a particular manner and for a particular purpose. It creates a burden on the servient tract and requires that the owner of that land refrain from interfering with the privilege conferred for the benefit of the dominant tract." *Stoney Creek Resort v. Newman,* 240 Va. 461, 464 (1990) (quoting *Brown v. Haley,* 233 Va. 210, 216-17 (1987)). An appurtenant easement "is capable of being transferred and inherited. Such an easement passes with the land to which it is appurtenant." *Coal Corporation v. Lester,* 203 Va. 93, 97 (1961) (citing *Scott v. Moore,* 98 Va. 668, 675; 17A Am. Jur., *Easements,* § 9, p. 624). Furthermore, "an easement is appurtenant to land, 'if it be in its nature an appropriate and useful adjunct of the land conveyed, having in view the intention of the grantee as to its use, and there being nothing to show that the parties intended it to be a mere personal right ....' "

*Id.* (quoting *Smith v. Garbe*, 86 Neb. 91, 124 N.W. 921, 923; 6 Mich. Jur., *Easements*, § 4, p. 469). No specific language is necessary to create an appurtenant easement, nor is it necessary to specifically mention such an easement in a later deed in order to pass it on. *Cushman Corp. v. Barnes*, 204 Va. 245 (1963); *Russakoff v. Scruggs*, 241 Va. 135 (1991).

In the case at hand, an appurtenant easement was created with the first deed given to Sarah Peterfish-Layman in 1888 by the language: "a right to the spring on the land laid off to Emma Peterfish and also a right-of-way along the Lucius Dovel line across the lots assigned to Andrew Jackson and Emma Peterfish to the public road." (Exhibit 2-A-1.) This language was repeated in the 1904 deed to Lillie Gibson and the 1961 deed to T. W. Mundy, a deed which the defendant herself signed. This easement, clearly appurtenant in its nature, runs with the land and benefits the current property holder.

The defendant, Henrietta Brown, claims that these deeds did not create a right-of-way to the water hole and spring on her land. She bases this contention on the fact that (1) the original deed sets the water hole and spring on "the land laid out to Emma Peterfish," that is not the location of the water hole and spring in dispute today, and (2) the deed created only one right-of-way and that is across the Lucius Dovel line, which leads up to the Emma Peterfish land. These two contentions, however, are erroneous. Brown's contention that the deed created only one right-of-way is contrary to the natural and clear language of the deed. The deed clearly states "a right-of-way to the spring on the land laid off to Emma Peterfish *and also* a right-of-way along the Lucius Dovel line ...." (Emphasis added.) The inclusion of the words "and also" act to create a second easement. If the original grantors intended for there to be only one easement, this language clearly would not have been used. Furthermore, "the language of a deed is to be taken most strongly against the grantor." *Mahoney v. Friedberg*, 117 Va. 520 (1915). Considering this fact, the deed must be read to convey two separate easements, one to the spring and one along the Lucius Dovel line.

Moreover, although the original deed identified the water hole and spring as being on Emma Peterfish's land, there was no evidence at trial of any such water hole or spring on her land. In fact, the defendant even testified that she has never actually seen such a spring on the Emma Peterfish land. Furthermore, various witnesses testified that despite the wording of the deed, the only water hole and spring that was ever used by persons living on the original Sarah Peterfish-Layman tract of land was the one in dispute today. Although there was some testimony to "other" springs and wet spots that existed from time to time on the Emma Peterfish property, no one could precisely locate them. Furthermore, all of the testimony indicated that they

were clearly inadequate to supply anything other than a very small quantity of water that was not sufficient for general farm use. See Deposition of R. Jenkins 23-33.

This court has viewed the property and witnessed first-hand the well-used road leading to that spring. It is quite evident that the water hole and spring currently on Brown's property has been used continuously and frequently for many years. Also important is the fact that Brown actually signed the 1961 deed conveying the property to T. W. Mundy. (Exhibit 2-A-6.) This deed specifically mentioned the right-of-way to a spring "as set out in the deed from Emma Peterfish and Mary Peterfish to Lillie F. Gibson." Furthermore, this deed specifically referenced and incorporated a plat of the conveyed land that showed a water right-of-way appurtenant to the conveyed land and crossing the servient land, then owned, at least in part, by Brown. This right-of-way was in the location of the existing "old farm road." Because Brown signed this deed, she cannot now deny that the easement was granted to the owner of this dominant tract of land. Even assuming *arguendo* that, as Brown contends, the original easement was not along this "old farm road," the 1961 deed unequivocally placed an easement there and, as such, that easement will run with the land and has passed to the current owner, the Plaintiff, Malcolm Sullivan. Brown signed this deed and she is, therefore, bound by it, and the plat that accompanies it. *Bossieux v. Shapiro*, 154 Va. 255, 260-61 (1930). Even if, as Brown claims, she was not aware of such an easement, when she acquired the servient tract in 1995, she had the responsibility of searching old deed books and discovering for herself that the tract was burdened by such an easement. Just because a purchaser fails to research a tract of land, it does not terminate such an easement.

Finally, although not directly on point, the Supreme Court of Virginia's most recent ruling in *Knewstep v. Jackson*, 259 Va. 263 (2000), is instructive. Like the facts in *Knewstep*, this case presents a situation in which the overwhelming weight of the evidence shows that the "right of way to the spring" referred to continually in the deeds was the one claimed by the plaintiff; there had been a continuing mutual mistake in referring to the spring and water hole as being on "the land laid off to Emma Peterfish" when, in fact, the spring and water hole was 270 feet to the south of Emma's land, on the land laid off to Andrew Jackson Peterfish. Such a mutual mistake does not preclude the plaintiff's claim to the water source referred to in the deed no matter how ill-described it may have been. In light of the foregoing, this court finds that the Plaintiff has a right-of-way over Defendant's land by way of a specific grant.

The Plaintiff also claims a right-of-way by reason of an implied easement of necessity through pre-existing use. Implied easements are created when "a common owner of property imposes an obvious and permanent use on one part of the property for the benefit of another part and sells each part to a different purchaser, an easement corresponding to the use may be deemed to have been conveyed along with them." *Fones v. Fagan*, 214 Va. 87, 91 (1973) (citing *Scott v. Moore*, 98 Va. 668, 683-84 (1900)). There are three requirements for such an easement. These requirements are: "(1) the dominant and servient tracts originated from a common grantor, (2) the use was in existence at the time of the severance, and (3) the use is apparent, continuous, and reasonably necessary for the enjoyment of the dominant tract." *Russakoff*, 241 Va. at 139. In the case at hand, it is not disputed that the dominant and servient tracts originated from a common grantor, namely Reuben Peterfish. Furthermore, evidence has clearly shown that at the time of severance, this "old farm road" was the way by which persons on the southernmost portion of the tract would access the water hole and spring. The evidence in this case has shown the use of this road to have been continuous. As previously mentioned, the court has personally viewed this property and seen firsthand the "old farm road" in dispute. The road is obvious and apparent to anyone on the two parcels of land; it is well-worn and follows the natural terrain. Furthermore, the old fence line is quite visible by looking at the old trees that line the road. These trees have the unmistakeable markings of having once been used as posts for a fence. Finally, the Plaintiff has satisfactorily demonstrated to this court that this water right-of-way is necessary for the enjoyment of this land. Sullivan has testified, as have other witnesses, that this water hole and spring has been his sole source of water for farming and his livestock for years. Moreover, he has testified that although he has drilled various wells on his property, only one of those has produced any water, and only enough for his household needs. This well is not sufficient to sustain a farming or livestock operation on this land. Due to the foregoing discussion, this court finds that Plaintiff has a right-of-way to the spring and water hole through an implied easement of necessity and pre-existing use.

Finally, Plaintiff claims that he has an easement by estoppel to the water hole and spring by way of the old farm road. Easements may be created by estoppel "if a vendor of land actually or constructively makes *representations* as to the existence of an easement appurtenant to the land sold to be enjoyed in the land which the vendor has not sold." *Walters v. Smith*, 186 Va. 159, 172 (1947) (quoting *Minor on Real Property* (Ribble ed.), vol. 1, sect. 104). As discussed earlier, in the case at hand, Brown was one of the grantors of the southern portion of land to T. W. Mundy. Included in this grant was a plat

showing the easement to the water hole and spring at the location of the old farm road. The water hole and spring, as well as the old farm road, as evidenced on the plat, were located on the land owned, at least in part, by Brown. By signing this deed, Brown conveyed an easement and may not now claim that such an easement does not exist.

This court finds that Plaintiffs, Malcolm R. Sullivan and Marguerite V. Sullivan, their successors, heirs, and assigns have a valid easement and water right-of-way to the water hole and spring located on Defendant Brown's land. This easement is by grant, implication, and estoppel. This easement shall be located "the old farm road" as is depicted in Exhibit M, the survey of Sullivan's and Brown's property that was prepared by David Lee Ingram, Land Surveyor. Furthermore, Sullivan is granted the right to construct a fence along this easement, as close to the existing, visible farm road as topographically practicable and reasonable, but in no case wider than the fence line set out in Exhibit M. This fence shall contain such gates and cattle guards as necessary to keep livestock inside the easement, yet still allow reasonable access through the easement from one part of Brown's property to the other. This court further grants a permanent injunction prohibiting Brown from destroying, removing, or otherwise interfering with fencing and gates along the bounds of the water right of way and a permanent injunction prohibiting Brown from obstructing the water right-of-way granted to Sullivan. Each party shall bear his or her own costs and attorney's fees.

The Clerk of the Court is directed to send certified copies of this order to Thomas E. Ullrich, Esq., Counsel for Plaintiffs; David J. Hatmaker, Esq., Counsel for Defendants; and Joan K. Fine, Esq., Counsel for Defendants.